IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THOMAS M. ABRAM,

     Plaintiff,

                                Civil Action 2:19-cv-2996
    v.                      Judge Edmund A. Sargus, Jr.
                                Chief Magistrate Judge Elizabeth P. Deavers

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Thomas M. Abram, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 16), the administrative record (ECF No. 7), and the supplemental administrative record (ECF No. 8).  For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case.

## I.    BACKGROUND

Plaintiff filed his application for disability insurance benefits in October 2013 and for supplemental security income in February 2014, alleging that he has been disabled since

February 1, 2013, due to spinal stenosis. (R. at 329-38, 352.) Plaintiff's applications were denied throughout the administrative process, including a denial by the Appeals Council. Upon initial review, the Court remanded this matter on April 5, 2018. (R. at 751-72; *see also Abram v. Comm'r of Soc. Sec.*, No. 2:17-CV-625, 2018 WL 1187803 (S.D. Ohio Mar. 7, 2018), *report and recommendation adopted*, No. 2:17-CV-625, 2018 WL 1638678 (S.D. Ohio Apr. 5, 2018)). Administrative Law Judge Noceeba Southern ("ALJ") held a second hearing on March 15, 2019, at which Plaintiff, represented by counsel, appeared and testified. (ECF No. 8, R. at 1493-1512.) On April 23, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 654–67.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.[1] Plaintiff timely commenced the instant action.

## II.  HEARING TESTIMONY

### A.  Plaintiff's Testimony

Plaintiff testified at the administrative hearing on March 15, 2019, that since the last hearing, his conditions were progressively getting worse. (R. at 1493.) In response to the ALJ's observation that he had not worn a brace on his right knee at the prior hearing, Plaintiff responded, "My knee seems to be bowing outward, some muscle degenerate [sic] I think. And the cartilage is deteriorating in the knee and I was told it as a tarsal tunnel -- no, a meniscus tear." (*Id.*) Plaintiff stated that he takes all of his prescribed pain medications. (R. at 1494.) He

---

[1] The Appeals Council's decision is not contained in the Certified Administrative Record. *See* ECF No. 7.

explained that the medications do not take all the pain away, but "take the edge off….get a little bit of my life back." (R. at 1496-97.) Plaintiff was first prescribed a cane in 2015. (R. at 1497.) His medications make him feel "foggy." (*Id.*)

Plaintiff further testified that his back pain and right leg weakness are the primary problems preventing him from working. (R. at 1498.) He testified that he has neck pain that goes down his arms, right shoulder pain, and a limited range of motion in his neck. (R. at 1499.) Plaintiff added that he has lower back pain and his right leg "gives out." Plaintiff testified that he got insoles to help with his foot pain, but he noted "[t]hey help somewhat but…. standing for periods of time is still just doesn't work as well as I think it should." (R. at 1500.) He further stated that he has had injections in his knee and his lower back. (R. at 1501.) Plaintiff also testified to limited use of his hands, noting that when he reaches out in front his neck can hurt. (R. at 1501-02.)

When asked how he spends his days, Plaintiff responded that he just stays at home on the couch and doesn't go out. (R. at 1503.) Plaintiff stated that his wife does the housework. (R. at 1505.)

### III.    RELEVANT MEDICAL RECORDS

### A.    Hospital and Objective Testing

Plaintiff underwent an MRI of his cervical spine on October 15, 2011, due to a four-year history of neck pain. (R. at 407.) The MRI revealed right neural foraminal narrowing at C3-4 and left neural foraminal narrowing at C6-7. (*Id*.) An MRI of Plaintiff's left shoulder was taken on April 6, 2012 due to complaints of left shoulder pain. (R. at 408.)

This MRI revealed mild edema of the acromioclavicular joint, supraspinatus tendinopathy with a broad-based partial bursal sided footprint tear.  (*Id.*)

On May 11, 2012, Plaintiff underwent rotator cuff repair surgery on his left shoulder.  (R. at 410-11.)

When Plaintiff was seen by his primary care physician, Dr. Jerry D. Mccreery,  in September 2013, Plaintiff reported having severe right greater than left arm pain (working on cars, pulling wrenches, etc.).  (R. at 416.)  He requested to see an orthopedic doctor.  He was diagnosed with carpal tunnel syndrome.  (*Id.*)

Plaintiff presented to the emergency room in September 2013 due to back pain.  (R. at 434.)  He reported shooting pain into the right and left legs, and that he was having trouble walking due to symptoms.  (*Id.*)  On examination, Plaintiff appeared to be in mild distress, he could walk without assistance but with some difficulty, there was an area of local muscle/spasm/tenderness over the lower lumbar spine, it was painful for him to bend at the back and he had an abnormal straight leg raise test.  (R. at 435.)  Plaintiff was assessed with acute exacerbation of chronic back pain.  (R. at 436.)

Plaintiff underwent an MRI of his lumbar spine in March 2014, which revealed degenerative changes in the lower lumbar region, with disc protrusions with annular fissures at the L4-5 and L5-S1.  (R. at 461.)

In July 2014, Plaintiff presented to the emergency department with complaints of pain in the right hip.  (R. at 477.)   As noted in his history, Plaintiff had been suffering from back pain since the previous September, and for the last five weeks, the pain in his right hip was also

4

radiating down his right side.  (*Id*.)  He was able to ambulate but that it was painful to do so. (*Id*.)

On examination, Plaintiff exhibited tenderness of the right-sided lower lumbar para vertebral

muscles and SI joint region.  (R. at 478.)  No midline bony spinal tenderness.  (*Id*.)  His reflexes

were equal +2 bilaterally.  (*Id*.)   Plaintiff was able to ambulate although he did limp favoring his

right leg.  (*Id*.)  There was also positive straight leg raise on the right.  (*Id*.)  Plaintiff was given a

shot for his pain and prescription medication along with information for back exercises.  (R. at

479-82.)

### B.    Michael Sayegh, M.D.

Plaintiff began treating with pain management specialist, Dr. Sayegh in May 2013 for his

chronic neck and back pain. (R. at 459.)   Plaintiff rated his pain at a level 9-10 on a 0-10 visual

analog scale.  (*Id*.)  Plaintiff described his pain as "an electrical, throbbing and constant pain in

his head, neck, right arm, left arm, mid-back, low back, right leg and left leg.  (*Id*.)  He stated

that "the pain [was] worse lately and he has had this pain for years with no clear accident or

injury."  (*Id*.)  He had tried different medications, physical therapy, a TENS unit, home therapy

such as exercise, heat, ice, rest and walking.  (*Id*.)  He denied having injections into his spine or

having spinal surgery.  (*Id*.)  Plaintiff further stated that he had been evaluated by a

neurosurgeon.  (*Id*.)  As reported by the Plaintiff, "the surgeon said he is a candidate, but they are

holding off for now."  (*Id*.)  On examination, Plaintiff's neck and mid-low back showed trigger

points and tenderness bilaterally in the paraspinal muscles; mild decreased sensation in bilateral

feet, worse on the right side; and a negative bilateral straight leg raising test.  (*Id*.)

Plaintiff continued to treat with Dr. Sayegh through July 2015.  (R. at 1101.)  Dr. Sayegh's examinations reveal neck and back pain, tenderness, decreased sensation in the upper extremities, pain in the left shoulder with limited range of motion, and pain in the lower extremities.  (R. at 452-60, 511-18, 613-14.)  Dr. Sayegh's diagnoses included lumbago, sciatica, spondylosis, cervicalgia, radiculopathy, degenerative disc disease, spinal and foraminal stenosis, pain in the shoulders and knees, and depression and anxiety among others.  (*Id.*)

Dr. Sayegh completed a questionnaire on behalf of the administration on March 12, 2014, with a revised version dated September 2, 2014.  (R. at 449-51, 502-04.)  Dr. Sayegh indicated that Plaintiff's diagnoses included lumbago, sciatica, spondylosis, cervicalgia, radiculopathy, degenerative disc disease, spinal and foraminal stenosis, myelopathy, and left shoulder pain status post-surgery.  (R. at 450, 503.)  Dr. Sayegh reported that, on clinical examinations, Plaintiff exhibited mid and lower back trigger points, tenderness bilaterally in the paraspinal muscles, and decreased sensation in Plaintiff's bilateral arms, hands, and legs.  (*Id.*)  Dr. Sayegh stated that Plaintiff had no issues with compliance that interfered with his treatment.  (R. at 451, 504.)  Dr. Sayegh found that Plaintiff's ability to concentrate and think clearly may be affected by his pain and medications such as opioid therapy.  (*Id.*)  Dr. Sayegh also opined that Plaintiff's ability to sit, stand, and walk were limited due to chronic pain and he could not bend, lift, stoop, crawl, or climb.  (*Id.*)

Dr. Sayegh completed another medical source statement on March 23, 2016, in which he listed Plaintiff's symptoms as chronic pain, weakness, and decreased sensation.  (R. at 623.)  Dr. Sayegh opined that Plaintiff could walk for 1 city block without needing to rest due to pain and

that he could stand and sit for 30 minutes at a time. (R. at 624.) According to Dr. Sayegh, Plaintiff could sit, stand, and walk for 2 hours each in an 8-hour work day. (*Id.*) Dr. Sayegh believed that Plaintiff could only rarely lift less than 10 pounds; and he could not twist, stoop, crouch, squat, or climb ladders. (R at 625.) Dr. Sayegh concluded that Plaintiff would be off task more than 25% of the workday, was capable of only low stress work, and that he would miss about three days of work per month. (R. at 626.)

### C. Brian J. Oricoli, M.D.

Plaintiff consulted with physical medicine and rehabilitation specialist, Dr. Oricoli, on March 18, 2016 for spinal stenosis and sciatica. (R. at 642.) Plaintiff reported "constant, dull aching, throbbing, stabbing, burning, and tingling, especially when standing and sitting for any period of time or with any physical activity. (*Id.*) He report[ed] experiencing 'massive electrical shocks' in the left foot causing him to lose his balance and stumble." (*Id.*) Plaintiff rated his pain severity at a level of 7 on a 0-10 visual analog scale. (*Id.*) On examination, Plaintiff exhibited limited cervical and lumbar spine range of motion, tenderness to palpitation along the midline cervical paraspinal muscles, seated straight leg raise was normal bilaterally. (*Id.*) Dr. Oricoli noted Plaintiff ambulated with a normal narrow based tandem gait pattern with the use of a straight cane. (R. at 642–43.) After discussing his other treatments and medications, testing revealed that Plaintiff did not have any opioids in his system, but he admitted "he ha[d] not been using his medication routinely, but he ha[d] been stretching this out not knowing if he would be seen by any physician to manage his care." (R. at 643.) Dr. Oricoli noted that based on

Plaintiff's subjective complaints, he was "concerned for significant nerve root compression." (*Id.*)

Plaintiff returned to Dr. Oricoli on March 25, 2016 for electrodiagnostic testing of his upper extremities. (R. at 641.) He was diagnosed with carpel tunnel syndrome. (*Id.*) Dr. Oricoli ordered an MRI of Plaintiff's cervical and lumbar spine. (*Id.*)

The lumbar spine MRI taken on April 4, 2016, showed minimal scattered degenerative changes with annual tear at the L4-L5 and L5-S1 levels. (R. at 648.) The cervical spine MRI revealed mild disc bulges without any spinal stenosis, some scattered facet arthropathy which causes minimal-mild neural foraminal narrowing at most levels with the exception of moderate-severe left-side foraminal narrowing at C3-4. (R. at 649.) Electrodiagnostic testing performed on April 8, 2016, of Plaintiff's lower limbs revealed tarsal tunnel syndrome. (R. at 1260.)

When seen on April 18, 2016, Dr. Oricoli noted Plaintiff had "reasonably stable complaints," rating his pain at a level of 4/10. (R. at 913.) He was able to use medication to reduce his pain. (*Id.*) He needed some assistance with bathing, dressing and writing, but was independent in grooming and toileting. (*Id.*) On examination, Plaintiff exhibited a slightly limited range of motion in his neck, slightly limited range of motion in his left shoulder, full strength in his arms, was ambulating with a cane, and had reduced range of motion and tenderness in his back. (R. at 913-14.)

In June 2016, Plaintiff reported a greater level of pain than had been typical for his most recent encounters because he had fallen asleep in an awkward position. (R. at 918-20.) His medications were discussed and adjusted. (*Id.*) In August 2016, Dr. Oricoli found Plaintiff was

8

"doing reasonably well" and made no medication adjustment. (R. at 1004-05.) Plaintiff was diagnosed with osteoarthritis of the right knee in September 2016. (R. at 1006-07.) In November 2016, Dr. Oricoli noted Plaintiff had normal coordination with decreased range of motion and a narrow based tandem gait with the use of a cane. Dr. Oricoli also noted that Plaintiff had responded favorably to medication. (R. at 1010-11.)

Plaintiff underwent an MRI of the right knee in April 2017, which showed osteoarthritis of the medial compartment with grade 4 chondromalacia. (R. at 1020.)

By April 2018, Plaintiff reported that he had neck pain only occasionally and admitted that the SI joint brace helped him when he was more active. (R. at 1356.) In January 2019, Dr. Oricoli noted that Plaintiff continued to have a normal narrow based tandem gait with a straight cane but had "significant improvement in his functional activity" with his medication regime. (R. at 1454-55.)

On January 31, 2019, Dr. Oricoli opined that Plaintiff could occasionally lift up to 10 pounds and could frequently lift 5 pounds, and occasionally reach bilaterally. (R. at 1483.) Dr. Oricoli also opined that Plaintiff could frequently finger and handle; sit, stand, and walk for less than an hour each during an 8-hour workday; and occasionally climb and bend but was precluded from crouching and crawling. (R. at 1484.) Dr. Oricoli concluded that Plaintiff would likely miss 2 or more days of work per month due to his condition and that his condition would likely deteriorate under the stress of full-time employment. (R. at 1485.)

### D.      State Agency Review

In April 2014, after review of Plaintiff's medical record, Maria Congbalay, M.D., opined that Plaintiff could lift twenty pounds frequently and ten pounds occasionally; stand/walk for about four hours out of eight, and sit for about 6 hours in an 8-hour day.  (R. at 203-04.)  Dr. Congbalay also found Plaintiff could occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs, but could never climb ladders/ropes/scaffolds due to decreased sensation in bilateral upper extremities as well as decreased range of motion in his left shoulder.  (R. at 204.)  Dr. Congbalay based Plaintiff's "postural limitations due to multiple [degenerative disc disease] of the LS with protrusions and annular fissures at L4-5 and L5-S1.  Thecal sacs are intact.  MRI of the CS also showed [bilateral] neural foraminal narrowing at C3-4 and C6-7 by osteophytes.  [Plaintiff] was noted to walk [without] assistance and is independent on ADLS."  (*Id.*)  In September 2014, Lynne Torello, M.D., reviewed the record upon reconsideration and affirmed Dr. Congbalay's assessment.  (R. at 234–36.)

## IV.    ADMINISTRATIVE DECISION

On April 23, 2019, the ALJ issued her decision.  (R. at 654-67.)  The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31,

2016. (R. at 656.) At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since February 1, 2013 his alleged onset date. (*Id.*) The ALJ found that Plaintiff had the severe impairments of cervical spondylosis, asthma, tarsal tunnel syndrome, lumbago, depression, anxiety, history of rotator cuff surgical repair of the left upper extremity, degenerative disc disease of the cervical and lumbar spine, osteoarthritis of the right knee, and sciatica. (*Id.*) She further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 657.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant can lift/carry 15 pounds occasionally and 10 pounds frequently, can sit and stand for 30 minutes at a time, can stand/walk for 4 hours in an 8 hour day, can sit for 6 hours in an 8 hour day,

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

can occasionally reach overhead with the right upper extremity, can occasionally climb ramps and stairs, occasional exposure to cold, heat, humidity and fumes such as odors dust and gases, avoid ladders, ropes and scaffolds, avoid hazardous machinery including unprotected heights and moving machinery, occasional stooping, kneeling, crouching and crawling, avoid driving, limited to simple routine tasks with occasional changes and occasional decision making with few detailed instructions, interaction with coworkers and supervisors no more than occasional, no fast pace work or strict production quotas, occasional use of foot controls with bilateral lower extremities, and the use of cane for ambulation.

(R. at 658-59.)

Relying on the VE's testimony, the ALJ found that Plaintiff's limitations precluded his ability to do perform his past relevant work as a route sales delivery driver, material handler, a mixer, or stock clerk.  (R. at 665.)  The ALJ concluded that Plaintiff could perform other jobs that exist in significant numbers in the national economy.  (R. at 666-67.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act at any time since February 1, 2013 the alleged onset date.  (R. at 667.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff sets forth one statement of error - that the ALJ failed to articulate good reasons

for according less than controlling weight to the opinions of treating physician Dr. Sayegh. (ECF

No. 11.)

The ALJ must consider all medical opinions that he or she receives in evaluating a

claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as

"statements from physicians and psychologists or other acceptable medical sources that reflect

judgments about the nature and severity of your impairment(s), including your symptoms,

diagnosis and prognosis, what you can still do despite impairment(s), and your physical or

mental restrictions."  20 C.F.R. § 416.927(a)(2).

      The ALJ generally gives deference to the opinions of a treating source "since these are

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a

patient's] medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R.

§ 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling

weight."  20 C.F.R. § 404.1527(d)(2).

      If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ

must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544

(6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling

weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the
> treatment relationship, supportability of the opinion, consistency of the opinion
> with the record as a whole, and the specialization of the treating source—in
> determining what weight to give the opinion.

*Id.*

      Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of

determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20

C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make

clear to any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x

543, 550 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the

Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that
> his physician has deemed him disabled and therefore "might be especially
> bewildered when told by an administrative bureaucracy that she is not, unless some
> reason for the agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d
> Cir.1999). The requirement also ensures that the ALJ applies the treating physician
> rule and permits meaningful review of the ALJ's application of the rule. *See
> Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v.

Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors

within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.

2010) (indicating that, under Blakley and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity.  20 C.F.R. § 404.1527(e).  Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

15

Here, the ALJ assigned "partial weight" to Dr. Sayegh's opinion, rejecting some limitations and accepting other limitations, reasoning as follows:

Dr. Sayegh is a pain medicine specialist and the claimant was referred to him by Dr. McCreery (Exhibit 6F). Dr. Sayegh treated the claimant over several years (Exhibits 6F, 14F). Dr. Sayegh completed a form describing the claimant's impairments, objective findings and reported symptoms (Exhibit 6F). Dr. Sayegh completed another form a few months later and set forth the same opinion (Exhibit 12F). His opinion has been given partial weight. He set forth limitations but did not give specific restrictions for instance he noted that the claimant had a "limited ability to sit/stand/walk" due to chronic pain (Exhibit 6F). This is consistent with the evidence as the record shows that the claimant has chronic pain and reasonably has some restrictions in his ability to sit, stand, and walk. However, Dr. Sayegh's opinion is not fully accepted because he also stated that the claimant could perform no lifting, but this is not consistent with the evidence. The claimant did not testify to a complete inability to lift, he is able to perform personal care, and in a more detailed form completed in 2016, Dr. Sayegh did not preclude all lifting (Exhibit 21F).

On March 23, 2016, Dr. Sayegh completed a medical source statement and set forth more specific restrictions (Exhibit 21F). This has been afforded partial weight. Dr. Sayegh stated that the claimant was no longer a patient, but he had treated the claimant from May 2013 through July 2015. Thus, while Dr. Sayegh was a treating source, he had not seen the claimant is over six months. Dr. Sayegh opined that the claimant could sit and stand for 30 minutes at a time but could do each for only two hours in a day. He also opined that the claimant may hourly need breaks for fifteen minutes and would be off tasks 25% or more (Exhibit 21F). However, the off tasks limitation is not accepted because throughout the record, the claimant had primarily normal mental status findings, was a good historian and had intact concentration. Dr. Sayegh noted that the hourly breaks were a possibility and not a limitation based on specific findings thus this also is not accepted. As set forth above, the claimant had generally conservative treatment for pain, reported pain in the low range on the pain scale and reported improvements with treatment and medications. Dr. Sayegh also did not have access to recent records and last examined the claimant in 2015. More recent records show that the claimant had intact sensation in the upper extremities, normal coordination in the upper extremities and only slightly restricted range of motion of the cervical spine with full strength in the bilateral upper extremities and near normal range of motion of the shoulders (Exhibits 24F, 42F/39, 52). The claimant has been diagnosed with asthma and thus the environmental restrictions set forth by Dr. Sayegh have been accepted.

16

(R. at 663.)

Plaintiff has identified three reasons previously relied upon by the ALJ in discounting Dr. Sayegh's opinion and rejected by this Court because they did not constitute good reasons – (1) internal inconsistency with respect to lifting limitations; (2) inconsistency with the record; and (3) length of time between end of treatment relationship and opinion.  (ECF No. 11, at p. 10.) Plaintiff contends that, on remand, the ALJ has continued to rely on two of these reasons – (1) the length of time between the end of the treatment relationship and the opinion and (2) inconsistency with the record.  Plaintiff asserts that these reasons as set forth by the ALJ the second time around continue to fail to meet the good reasons standard.  The Commissioner concedes that neither the lapse of time between treatment and opinion nor any alleged internal inconsistency in lifting restrictions meet the good reasons threshold.  However, the Commissioner contends that, on remand, the ALJ reasonably explained how Dr. Sayegh's opinion is inconsistent with other evidence in the record.  For the following reasons, the Undersigned agrees with Plaintiff that, in again citing inconsistency with the record as a basis for discounting Dr. Sayegh's opinion, the ALJ failed to meet the good reason standard.

To say the least, the ALJ's explanation is not a model of clarity.  The Commissioner admits as much in the opening sentence of the Memorandum in Opposition.  ("The administrative law judge (ALJ) decision here is flawed and imperfect."  (ECF No. 16, at p.1.)  For example, as the parties acknowledge, despite having already been instructed by this Court that the lapse in time between treatment and opinion did not constitute a good reason for discounting Dr. Sayegh's opinion, the ALJ cites this specific reason not once but twice.  ("he had not seen the claimant in over six months"  "Dr. Sayegh … last examined the claimant in 2015." R. at 663.)  Further, although the

17

Court having explained in some detail that any internal inconsistency in Dr. Sayegh's opinion regarding lifting limitations also failed to meet the good reason standard, the ALJ again cites that as a basis.  The ALJ's reliance on these discredited rationales causes her explanation to be, at a minimum, confusing.  As a result, the Undersigned is unable to discern from the ALJ's discussion how much these previously rejected reasons impacted the decision to accord Dr. Sayegh's opinion only partial weight.

Moreover, the ALJ does little to shore up the reasoning that Dr. Sayegh's opinion is inconsistent with the record.  Much of the explanation is conclusory.  ("the claimant had primarily normal mental status findings, was a good historian, and had intact concentration" "the claimant had generally conservative treatment for pain, reported pain in the low range on the pain scale and reported improvements with treatment and medications." R. at 663.)   The ALJ also fails to acknowledge the evidence previously highlighted by the Court that suggests record support for Dr. Sayegh's findings.  ("Indeed x-rays and MRIs consistently showed degenerative changes, disc protrusions, and mild to severe foraminal narrowing. (Doc. 6-7, Tr. 407, 461, 480, 519, 611-12, 648-50, PAGEID #: 451, 505, 524, 563, 655-56, 692-94).  Further, treatment notes from various doctors consistently revealed tenderness over the lower lumbar spine *(id.,* Tr. 435, 477-78, 621, 639-40, PAGEID #: 479, 521-22, 665, 683-84), decreased range of motion *(id.,* Tr. 621, 639-40, 642-43, PAGEID #: 665, 683-84, 686-87), and several positive/abnormal straight leg raise tests *(id.,* Tr. 435, 477-78, 621, 639- 40, 642-43, PAGEID #: 479, 521-22, 665, 683-84, 686-87)"  (R. at 764.)

At best, the ALJ cites to more recent records which she characterizes as documenting improvement, including Dr. Oricoli's office notes from March 2016 (R. 641-647); office clinic

18

notes from May 2018 (R. at 1365); and office clinic notes from June 2018.   (R. at 1378.)

However, as Plaintiff points out, these very same records also document significant limitations.

As a sampling, these records continue to assess multiple conditions including cervicalgia,

degenerative cervical disc, lumbar disc degeneration.  (R. at 642-643; 1365; 1378.)   Further,

again by way of example, they indicate cervical range of motion limited to 30 degrees;

tenderness along the midline cervical paraspinal muscles; restricted lumbar range of motion;

tenderness/muscle tension in the lower lumbar region.  (*Id.*)   Moreover, Dr. Oricoli, provided an

opinion that seems to align with Dr. Sayegh's view.  Specifically, Dr. Oricoli noted in part that,

due to chronic pain, Plaintiff would likely miss two or more days of work per month and his

condition would likely deteriorate under stress of full-time employment.  (R. at 1488.)

An "'ALJ must consider all the record evidence and cannot 'pick and choose' only the

evidence that supports his [or her] position.'" *Carter v. Comm'r of Soc. Sec.,* 137 F. Supp. 3d

998, 1006–07 (S.D. Ohio 2015) (quoting *Hawthorne v. Comm'r of Soc. Sec.,* No. 3:13–cv–179,

2014 WL 1668477, at *9 (S.D. Ohio Apr. 25, 2014)) (citations omitted).  Further, referencing

only improved musculoskeletal findings—while ignoring the findings referred to above—is not a

good reason to discount a treating physician's opinion.  *Id.* (citing *See Moyers v. Astrue,* No. 10–

282–GWU, 2011 WL 3475426, at *5 (E.D. Ky. Aug. 9, 2011)).

The ALJ's continued reliance on previously discredited reasoning and lack of explanation

as to why Dr. Sayegh's opinions were inconsistent with the record hinders meaningful review

here.  Absent the ability to undertake such review, the Undersigned is unable to conclude that the

ALJ's decision was supported by substantial evidence.  Accordingly, it is **RECOMMENDED** that Plaintiff's contention of error be **SUSTAINED**.

### VII.    CONCLUSION

Due to the error outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).  Accordingly, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

### VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   July 31, 2020                                  _____/s/ *Elizabeth A. Preston Deavers*
                                                       Elizabeth A. Preston Deavers
                                                       Chief United States Magistrate Judge